12-1680-cv
SEC v. Pentagon Capital Management

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2012

(Argued: April 9, 2013     Decided: August 8, 2013)

Docket No. 12-1680-cv

-------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff-Appellee,

    -- v. --

PENTAGON CAPITAL MANAGEMENT PLC, LEWIS CHESTER,

    Defendants-Appellants,

PENTAGON SPECIAL PURPOSE FUND, LTD.,

    Relief Defendant.

-------------------------------------------------------x

B e f o r e : WALKER and CHIN, Circuit Judges, and RESTANI, Judge.*

Defendants-Appellants Pentagon Capital Management and Lewis Chester appeal from the 2012 judgment of liability of the United States District Court for the Southern District of New York (Sweet, Judge). After a bench trial, Defendants-Appellants were found liable for securities fraud under Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5. The district court ordered disgorgement and imposed a civil penalty. Both monetary awards were imposed jointly and severally in the amount of $38,416,500. We find no error in the district court's determination of liability, its disgorgement

* The Honorable Jane A. Restani, of the United States Court of International Trade, sitting by designation.

award, or its decision to impose joint and several liability for the disgorgement amount, but we reverse the district court's imposition of joint and several liability for the civil penalty, vacate that penalty, and remand for reconsideration of the amount of the civil penalty in light of the Supreme Court's decision in Gabelli v. SEC, 133 S. Ct. 1216 (2013).  AFFIRMED in part, VACATED in part, and REMANDED in part.

BENJAMIN L. SCHIFFRIN (Michael A. Conley, John W. Avery, Susan S. McDonald, David Lisitza, on the brief), Securities and Exchange Commission, Washington, DC, for Appellee.

FRANK C. RAZZANO (Ivan B. Knauer, Matthew D. Foster, John C. Snodgrass, on the brief), Pepper Hamilton LLP, Washington, DC, for Defendants-Appellants.

JOHN M. WALKER, JR., Circuit Judge:

Defendants-Appellants Pentagon Capital Management and Lewis Chester appeal from a judgment of the United States District Court for the Southern District of New York (Sweet, Judge).  After a bench trial, the district court found the defendants liable for securities fraud under Section 17(a) of the Securities Act of 1933 (the "Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5; ordered disgorgement; and imposed a civil penalty.  Each monetary award was imposed jointly and severally in the amount of $38,416,500.  We

2

find no error in the district court's determination of liability, the amount of its disgorgement award, and its decision to impose that award jointly and severally. But we reverse the district court's imposition of joint and several liability for the civil penalty, vacate that penalty, and remand for reconsideration of its amount in light of the Supreme Court's decision in Gabelli v. SEC, 133 S. Ct. 1216 (2013).

**BACKGROUND**

We assume the parties' familiarity with the background of this case and recite only those facts relevant on appeal. For additional detail, we refer the parties to the district court's thorough opinion. See SEC v. Pentagon Capital Mgmt. PLC, 844 F. Supp. 2d 377 (S.D.N.Y. 2012). The basis for the district court's imposition of fraud liability was the defendant's practice of late trading in the mutual fund market. Late trading occurs when, after the price of a mutual fund becomes fixed each day, an order is placed and executed as though it occurred at or before the time the price was determined, thereby allowing the purchaser to take advantage of information released after the price becomes fixed but before it can be adjusted the following day.

**I.   Mutual Funds and Late Trading**

Mutual fund shares are priced according to the fund's "net asset value," or NAV. SEC Rule 22c-1, promulgated under the

Investment Company Act of 1940, requires that a mutual fund calculate its NAV at least once per day, Monday through Friday. 17 C.F.R. § 270.22c-1(b)(1) (2013). A mutual fund's NAV is generally calculated "by using the closing prices of portfolio securities on the exchange or market on which the securities principally trade." Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, 68 Fed. Reg. 70,402-01, 70,403 (proposed Dec. 17, 2003) (to be codified at 17 C.F.R. pts. 239, 274) (final rule adopted in 69 Fed. Reg. 22,300). However, if the closing price of a security held in a mutual fund's portfolio does not reflect its current market value at the time of the fund's NAV calculation, a mutual fund must calculate its NAV "by using the fair value of that security, as determined in good faith by the fund's board." Id. This could occur, for example, when some price-affecting event occurs after the closing price is established but before the fund's NAV calculation. If a mutual fund's shares are mispriced, "an investor may take advantage of the disparity between the portfolio securities' last quoted prices and their fair value." Id.

Rule 22c-1 also requires that mutual funds "sell and redeem their shares at a price based on the NAV next computed after receipt of an order," a practice called "forward pricing." Id. (emphasis added); see also 17 C.F.R. § 270.22c-1(a). Forward pricing prevents dilution of mutual fund shares by keeping traders

4

from profiting off of a stale share price.  Some mutual fund investors, however, engage in late trading, "the practice of placing orders to buy or redeem mutual fund shares after 4 p.m., Eastern time, as of which most funds calculate their [NAV], but receiving the price based on the 4 p.m. NAV," instead of the next day's NAV, as required by Rule 22c-1.  Disclosure, 68 Fed. Reg. at *70,402.  In VanCook v. SEC, 653 F.3d 130 (2d Cir. 2011), we held that such late trading violated Rule 22c-1.

## II.   Pentagon Capital Management

Chester formed Pentagon Capital Management ("Pentagon") in 1998 to facilitate mutual fund trading in the European markets with a market timing strategy.[1]  In 1999, Chester and Pentagon explored the possibility of market timing and late trading in the United States mutual fund market.[2]  To facilitate its trading in the United

---

[1] If a mutual fund misprices its shares, such as by failing to appropriately use fair value pricing, "short-term traders have an arbitrage opportunity that they can use to exploit the fund and disadvantage the fund's long-term investors by extracting value from the fund without assuming any significant investment risk." This practice is known as "market timing."  Disclosure, 68 Fed. Reg. at 70,403.  Because market timing can dilute the value of long-term shareholders' interests in a mutual fund, many funds have imposed trading restrictions to minimize the practice, including "identifying market timers and restricting their trading privileges or expelling them from the fund."  Id. at 70,404.

[2] International market timers can have an additional advantage because they

> profit from purchasing or redeeming fund
> shares based on events occurring after foreign
> market closing prices are established, but
> before the events have been reflected in the

States, Pentagon formed Pentagon Special Purpose Fund ("PSPF"), the relief defendant in this case. PSPF was the sole member and manager of three Delaware limited liability companies that were established solely for Pentagon's use in trading mutual funds in the United States. At all times relevant to this case, Pentagon was PSPF's investment advisor and made all of its trading decisions.

In the United States, unlike in Europe, Pentagon was required to trade through a broker. As relevant here, Pentagon primarily used two individual brokers, James Wilson and Scott Christian, first at other brokerage firms, and finally at Trautman, Wasserman & Company ("Trautman"). Pentagon began trading through Trautman on February 15, 2001.

Based on Pentagon's instructions, Wilson and Christian executed Pentagon's trades through Bank of America, Trautman's clearing broker. Notwithstanding that the NAV was normally fixed at 4:00 p.m., Bank of America used a processing system for mutual fund orders that allowed brokers to change an order until 5:15 p.m. or 5:30 p.m. and later, until 6:30 p.m.

---

fund's NAV. In order to turn a quick profit, market timers then reverse their positions by either redeeming or purchasing the fund's shares the next day when the events are reflected in the NAV.

SEC v. Gabelli, 653 F.3d 49, 53 (2d Cir. 2011), rev'd on other grounds, 133 S. Ct. 1216 (2013).

The parties do not dispute that Pentagon utilized Bank of America's permissive clearing system to engage in late trading with the assistance of Trautman's brokers. Pentagon opened 67 different accounts with Trautman, each of which could trade separately without a mutual fund knowing they were related. Wilson and Christian registered the accounts with different broker numbers with the effect that if a mutual fund detected late trading or market timing and blocked one account from trading, other accounts could remain active. Pentagon knew that various of its accounts had been expelled from at least thirteen funds, but it continued to trade in those funds using different accounts.

In April 2001, Chester sent an email to Wilson and Christian detailing Pentagon's "After Hours Trading Instructions." Chester instructed that Wilson and Christian would receive a target figure on the Standard & Poors ("S&P") future[3] near the close of the markets from a Pentagon employee; then, if the future exceeded or fell below the target, the brokers were to contact Pentagon to ask them what to do. Chester then emailed other executives at Pentagon about the potential for late trading through Trautman:

---

[3] Black's Law Dictionary defines futures as "standardized assets (such as commodities, stocks, or foreign currencies) bought or sold for future acceptance or delivery." Black's Law Dictionary 746 (9th ed. 2009). Whether an index future (like the S&P future) rises or falls depends on whether other investors believe the stocks comprising that index will rise or fall on a specified date in the future.

> For this week only, [Trautman] can place or cancel any trades up to 5:00pm (10pm UK time). From next week – [Trautman] to confirm – the time will be 6:30pm (11:30 pm UK time).
>
> The significance of this is great.
>
> For instance, last night, the S & P future shot up at around 9:45pm [UK time]. Even though we hadn't placed any trades before 9pm [UK time], we STILL COULD HAVE PLACED THE TRADE after the bell, which we should have done given the marked rise in the future.
>
> I have been in Jimmy [Wilson's] office. Every day, whether we do a trade or not, they time-stamp our trade sheets before 4pm, and then sit on them until they leave the office, at which point they will process them or not. Hence, the ability to place a buy order after the bell, even if we haven't done so before the bell.
>
> . . .
>
> This facility is VERY VALUABLE and we should utilize it accordingly.
>
> . . .
>
> It doesn't matter whether we place trades or not before the bell, we can do so afterwards, up to Trautman's time limits.

Pentagon, 844 F. Supp. 2d at 400-01 (alterations omitted).

Thereafter, Christian would create potential trade sheets for Pentagon each day and time-stamp them before 4:00 p.m., notwithstanding that the actual decision to place the order or not would be made after 4:00 p.m. Then, sometime after 4:00 p.m., a Pentagon employee would email Christian the instructions for

8

Pentagon's late trades for that day.  The district court found that Pentagon realized profits of "approximately $38,416,500 from the U.S. mutual fund [late] trades they executed through [Trautman]" between February 15, 2001 and September 3, 2003.  Id. at 427.

Pentagon tried to conceal its late trading activities.  For example, on July 30, 2002, Chester sent an email to a broker that instructed him not to use the words "market timing" (which, viewed broadly, includes late trading) on any correspondence, telling him "'to label what we do . . . "dynamic asset allocation," but never market timing!'"  Id. at 396.  In August 2002, Chester instructed another Pentagon employee to "phone around First Union" to see if late trading was available because "late trading is key," adding "[I] don't know how you find out about this [late trading] without actually saying it.  No doubt you'll work it out!"  Id. at 408.

In September 2003, the New York Attorney General announced that it had settled an enforcement action with Canary Capital Partners for violations of the New York State securities laws, including late trading.  Shortly thereafter, Chester received a request from an investor for a letter stating that Pentagon had not engaged in late trading or any other illegal activity.  Chester provided the letter, stating that Pentagon had "'never entered into arrangements with any U.S. onshore Mutual Fund in order to trade post-4:00pm EST for same-day NAV,'" and that all of Pentagon's

trading arrangements were "'in accordance with the relevant rules, regulations, investment prospectus, and/or any other such relevant documentation relating to the investment(s) concerned.'" Id. at 410.

On April 3, 2008, the SEC brought this enforcement action against Pentagon. The complaint alleged that Pentagon's market timing and late trading activities violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5. After a seventeen-day bench trial, the district court found Chester and Pentagon primarily liable for late trading.[4] The district court found that appellants "did not act merely in reliance on their broker-dealers . . . [but] directed, indeed micromanaged, the late trading that [Trautman] performed on their behalf."[5] Id. at 421. The district court entered an injunction prohibiting Pentagon from late trading in the future. It also held Pentagon, Chester, and PSPF jointly and severally liable for a $38,416,500 disgorgement

---

[4] The district court found that because market timing is not illegal per se and because the SEC "did not establish the funds' particular market timing rules . . . or that Defendants in fact took actions that would have operated a fraud with respect to those rules," that the defendants were not liable under the securities laws for their market timing activities not involving late trading. SEC v. Pentagon Capital Mgmt. PLC, 844 F. Supp. 2d 377, 416 (S.D.N.Y. 2012).

[5] With respect to late trading, because the district court made a finding of primary liability, it did not reach the question of whether defendants had aided and abetted Trautman in the late trading scheme. See id. at 423. Hence, the question of aider-and-abettor liability is not presented on this appeal.

award and $38,416,500 in civil penalties.  The amount of $38,416,500 was based on the district court's valuation of the profit Pentagon, Chester, and PSPF realized in late trading through Trautman between February 15, 2001 and September 3, 2003.  This appeal followed.

**DISCUSSION**

On appeal, Pentagon and Chester argue that they cannot be held liable because their actions involved no fraud or deceit and that as investment advisors (as opposed to brokers), they cannot be held primarily liable for securities fraud.  They further argue that the district court made various errors related to the monetary awards.  Following a bench trial, we review the district court's findings of fact for clear error and its legal conclusions de novo.  SEC v. Mayhew, 121 F.3d 44, 50 (2d Cir. 1997).

**I.   Primary Liability for Securities Fraud**

Section 17(a) of the Securities Act makes it

> unlawful for any person in the offer or sale of any securities . . .
>
> (1)   to employ any device, scheme, or artifice to defraud, or
> (2)   to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3)   to engage in any transaction, practice, or course of business which operates or

11

would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a) (2012). Section 10(b) of the Exchange Act, in relevant part, makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b) (2012). Finally, Rule 10b-5, implementing Section 10(b), includes three subsections:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2013).

We have held that to violate Section 10(b) and Rule 10b-5, a party must have "(1) made a material misrepresentation or a

12

material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999). The requirements for a violation of Section 17(a) apply only to a sale of securities but in other respects are the same as Section 10(b) and Rule 10b-5, except that "no showing of scienter is required for the SEC to obtain an injunction under [Section 17] (a)(2) or (a)(3)." Id.

Pentagon and Chester do not deny that they engaged in late trading. The defendants argue, however, that there was no fraud or deceit in their actions. The defendants also argue that an investment advisor—as opposed to a broker—may not be held liable for securities fraud because the advisor is not responsible for communicating the direction to late trade to the clearing broker. We reject both arguments.

First, the defendants' argument that their lack of fraudulent or deceitful intent bars a finding of liability fails because deceitful intent is inherent in the act of late trading. The late trader places an order after the daily mutual fund price is set, but receives the benefit of additional information that the earlier price does not reflect. For this reason, we have held that late trading violates all three subsections of Rule 10b-5 because, as discussed above, it violates Rule 22c-1, the forward-pricing rule.

13

See VanCook, 653 F.3d at 138.  In VanCook, an individual broker sought out a clearing broker that would allow him to clear late trades, used time-stamped trade sheets as evidence that orders were placed before 4 p.m. when they were not, and assured his employer that he had not facilitated late trading.  In short, "he was [the scheme's] architect."  Id. at 139.  We found that VanCook went beyond making misrepresentations, taking "a series of actions over several years to implement a scheme that he devised."  Id.  On these grounds, we held that VanCook's late trading violated all three subsections of Rule 10b-5.  Although Section 17(a) was not at issue in VanCook, the requirements for a violation of Section 17(a), as relevant here, are identical to the requirements for a violation of Section 10(b).  Thus, we have no trouble concluding that Section 17(a) is also implicated by late trading activity (so long as some of the late trading involves the sale of securities).

Pentagon and Chester engaged in similarly deceitful behavior.  They sought out brokers who would engage in late trading.  As evidenced by Chester's email, they knew that the trade sheets were time-stamped before 4 p.m., even though they had no intention of trading before that time.  Finally, they issued a false and deceitful letter of assurance that they were not engaging in late trading, similar to VanCook's false assurances to his employer.

14

The defendants are not identically situated to VanCook, however. VanCook was a broker, directly bound by the language of Rule 22c-1, which applies to issuers of securities, persons "authorized to consummate transactions in any such securit[ies]," principal underwriters, and dealers in securities. 17 C.F.R. § 270.22c-1(a). Investment advisors are not explicitly mentioned in Rule 22c-1, but that is of no moment when the claims are brought under Sections 17 and 10 and Rule 10b-5. Pentagon and Chester were as much the "architects" of this scheme as VanCook was, and they orchestrated the late trading program carried out by their brokers. They are liable under Section 17(a), Section 10(b), and Rule 10b-5 because their actions caused the misrepresentations as to the time of the trades and led to their concomitant deception.[6] Pentagon's role as an investment advisor therefore does not shield it from liability under the securities laws.

---

[6] We endorse the reasoning of the district court in SEC v. Simpson Capital Management, Inc., 586 F. Supp. 2d 196 (S.D.N.Y. 2008), which dealt with the late trading activities of an investment advisor and the relevance of Rule 22c-1 in the context of a motion to dismiss. In Simpson, the SEC alleged that the investment advisor "was responsible for all investment decisions[,] . . . carefully identified individuals . . . who agreed to participate in the late trading scheme[, and] . . . orchestrated late-trading schemes." Id. at 208. We endorse the district court's finding in Simpson that these allegations were sufficient to state a claim for primary 10b-5 liability against an investment advisor. Specifically, the district court reasoned that "the existence of [Rule 22c-1] . . . provides the background for why the defendants . . . engaged in a scheme where they could obtain the prices that were set as of 4:00 p.m. ET, even though their transactions actually occurred at a later time." Id. at 203.

We also reject the defendants' corollary argument that they may not be held liable because they did not communicate directly with the mutual funds.  In Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), shareholders of Janus Capital Group sued Janus Capital Group and Janus Capital Management for making false statements in mutual fund prospectuses filed by Janus Investment Fund.  Because Janus Investment Fund retained ultimate control over the content of the prospectuses, the Supreme Court held that Janus Capital Management could not be liable as a "maker" of the statement under Rule 10b-5:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.

Id. at 2302.  To illustrate its point, the Supreme Court used the analogy of "the relationship between a speechwriter and a speaker.  Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it."  Id.  Pentagon and Chester argue that because they never communicated directly with the mutual funds, they cannot be held liable as "makers" of any false statements.

16

To the extent that late trading requires a "statement" in the form of a transmission to a clearing broker, we find that in this case, Pentagon and Chester were as much "makers" of those statements as were the brokers at Trautman. The brokers may have been responsible for the act of communication, but Pentagon and Chester retained ultimate control over both the content of the communication and the decision to late trade.

Moreover, we reaffirm our holding in VanCook and find that the defendants' activities violated all three subsections of Rule 10b-5, not just subsection (b), which was the only subsection at issue in Janus. Pentagon's late trading activity, beyond the communication of the trades themselves, included finding brokers and a clearing system that would allow late trades, as well as the specific coordination—on a daily basis—of the transmission of instructions to buy or sell or refrain from doing so based on NAVs and after-hours information. In short, Pentagon's fraudulent activities independently satisfy the requirements of scheme liability under Rule 10b-5(a) and (c) and Section 17(a).

We have considered the remainder of Pentagon's arguments and find them to be unpersuasive. The district court's determination of liability is affirmed.

17

## II. Monetary Awards

The district court imposed joint and several liability for a disgorgement award and a civil penalty, each in the amount of $38,416,500. The district court first determined that both monetary awards would be imposed jointly and severally because the defendants (including the relief defendant) "collaborated on the mutual fund trading scheme, and [Chester and Pentagon] exercised complete control over PSPF's trading." 844 F. Supp. 2d at 425. The district court then determined that a disgorgement award of $38,416,500 was appropriate because it was a reasonable approximation of the profit made through defendants' late trades with Trautman beginning in February 2001. Turning to the amount of the civil penalty, the district court applied Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act. Because the violation involved "'fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement' and 'directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons,'" the district court awarded the maximum penalty, in this case, the gross amount of the pecuniary gain. Id. at 427 (quoting 15 U.S.C. §§ 77t(d), 78u(d)(3)). On appeal, Pentagon argues that the district court erred in setting the amounts and in imposing joint and several liability.

18

**A. Civil Penalty**

We review the district court's imposition of the civil penalty for abuse of discretion. See SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005) ("The tier determines the maximum [civil] penalty, with the actual amount of the penalty left up to the discretion of the district court.").

In light of the Supreme Court's recent decision in Gabelli, 133 S. Ct. 1216, rendered after the district court's decision, we must vacate the district court's civil penalty award and remand it for reconsideration. In Gabelli, the Supreme Court held that the so-called "discovery rule," which tolls a statute of limitations for crimes that are difficult to detect, does not apply to toll the five-year statute of limitations for fraud cases in SEC enforcement actions. See id. at 1221-24. Thus, any profit earned through late trading earlier than five years before the SEC instituted its suit against the defendants may not be included as part of the civil penalty. All parties agree that remand on this issue is required.

We also must reverse the district court's decision to impose joint and several liability for the amount of the civil penalty as an error of law. See Johnson v. Univ. of Rochester Med. Ctr., 642 F.3d 121, 125 (2d Cir. 2011) ("A court abuses its discretion when . . . its decision rests on an error of law . . . .") (per curiam). The statutory language allowing a court to impose a civil penalty

19

plainly requires that such awards be based on the "gross amount of pecuniary gain to such defendant."  15 U.S.C. § 77t(d)(2) (emphasis added).  This language does not provide room for the district court's interpretation that the civil penalty be imposed jointly and severally.[7]

**B. Disgorgement Award**

The district court's disgorgement award is also reviewed for abuse of discretion.  See SEC v. Warde, 151 F.3d 42, 49 (2d Cir. 1998).

We find no abuse of discretion in the amount of the disgorgement award, which reflected a "reasonable approximation of profits causally connected to the [late trading] violation."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1475 (2d Cir. 1996) (quotation marks omitted).[8]  It was reasonable for the district court to consider the profit to PSPF as well as Chester and Pentagon in light of the fact that PSPF existed only to enable

---

[7] Although we vacate the civil penalty award, we find no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation.  See 15 U.S.C. § 77t(d)(2)(C) ("[T]he amount of penalty for each such violation shall not exceed the greater of (i) $100,000 for a natural person or $500,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation." (emphasis added)).

[8] Aside from appellants' assertion that the disgorgement award should be considered a penalty because it incorporated profits earned by PSPF, an argument we reject, we do not understand the appellants to argue that a disgorgement award would be subject to the statute of limitations provided by 28 U.S.C. § 2642.

Pentagon's trading in the United States. See SEC v. AbsoluteFuture.com, 393 F.3d 94, 96 (2d Cir. 2004) ("It is only logical that the total disgorgement of multiple defendants be determined by the total amount of profit realized by those defendants.") (per curiam).

We also affirm the district court's decision to impose the disgorgement award jointly and severally on all defendants. Unlike the civil penalty, there is no statutory requirement that a disgorgement award be measured as to each individual defendant. The district court found that relief defendant PSPF opened accounts at Pentagon's direction and that defendants late-traded on PSPF's behalf. Hence, the district court found that defendants and PSPF had "collaborated" on the late trading scheme, and concluded that joint and several liability with respect to disgorgement was warranted. See id. at 97 (in reviewing disgorgement award, holding that "joitn and several liability for combined profits on collaborating . . . parties" is "appropriate"). We agree with the district court that, in light of their collaboration, Pentagon, Chester, and PSPF should be held liable for the disgorgement award on a joint and several basis. See First Jersey, 101 F.3d at 1475-76 (affirming district court's decision to impose joint and several liability of disgorgement award).

**CONCLUSION**

For the foregoing reasons, the district court's rulings are AFFIRMED in part, VACATED in part, and REMANDED in part for further proceedings in accordance with this opinion.